1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8    ARIANN J-HANNA,                )
9                                   )
          Plaintiff,                )
10                                  )    No. CIV 10-504-TUC-CKJ
     vs.                            )
11                                  )         **ORDER**
     TUCSON DODGE INC., et al.,     )
12                                  )
          Defendants.               )
13   _____ )

14        Pending before the Court is the Motion for Summary Judgment (Doc. 125) filed by

15   Enterprise Rent-A-Car Company of San Francisco, LLC ("Enterprise").[1]   The parties

16   presented oral argument to the Court on December 2, 2013.

17

18   *Factual and Procedural Background*

19        Although not clearly set forth in the parties' documents, it appears an individual

20   rented the 2006 Chrysler Pacifica ("the Chrysler") at issue in this case from Enterprise.  The

21   renter did not return the Chrysler as arranged.  After a period of time, Enterprise reported the

22   Chrysler as stolen.  After the Chrysler was the "victim" of a hit-and-run in a Home Depot

23   parking lot, the Chrysler was towed and returned to Enterprise.  A "she" informed Enterprise

24   the Chrysler had been the victim of the hit-and-run. Enterprise Statement of Facts ("ESOF"),

25   Ex. 10. It is not clear who the "she" is – the renter, the tow truck driver, or a private

26

27   _____

28        [1]A Motion to Vacate (Doc. 189) and a Motion to Admit (Doc. 194) are also pending
     before the Court.  Those motions will be addressed in a separate order.

1   investigator.  Law enforcement was not involved in the return of the vehicle; rather a private

2   investigator hired by Enterprise retrieved the Chrysler from the renter.  Because the Chrysler

3   was returned, Enterprise views the incident as an embezzlement as opposed to a theft.

4         Enterprise asserts the records of Enterprise regarding the Chrysler indicate that, prior

5   to the embezzlement, there was a deep scratch at the rear of the driver's side quarter panel

6   which had been repaired.  The records do not have any indication of any frame damage to

7   the Chrysler.  The records also indicate that the Chrysler had been kept too long by a renter,

8   obtained for return by a private investigator, and there was damage to the rear bumper; the

9   records do not indicate any frame damage at any time.  The records also indicate that other

10  scratches were on the Chrysler in May and July of 2006, including a deep scratch underneath

11  the passenger side front headlight, and that those scratches were repaired (again, without any

12  statement of frame damage).  Enterprise records also indicate that the Chrysler was removed

13  from service and the Chrysler was inspected – minor cosmetic damage (scratches, scuffs and

14  dings) was repaired before being sold at auction.  Plaintiff Ariann J-Hanna ("J-Hanna")

15  points out that the records also indicate that sheet metal was used to repair the right, front

16  fender area.

17        Enterprise asserts that, other than cosmetic damage, it is unaware of any accidents

18  involving the Chrysler and is unaware of any frame damage that might need to be disclosed

19  to any potential purchaser.  A Chrysler Group LLC ("Chrysler Group") Vehicle Inspection

20  Report states:

21         The vehicle frame showed to have been impacted several times, with one severe
           impact to the right front cradle structure causing a severe dent in the metal. This could
22         have moved and/or changed the shape of the engine cradle causing the frame to be up
           to 5 millimeters out of specifications. This could be a source of tire wear concern, but
23         there was no indication that this has caused a problem with the motor mounts or a
           problem with driver seat alignment.
24

25  Doc. 152-1, p. 45 of 69.  A declaration by Sergio Lujan ("Lujan")[2], a certified ASE

26  mechanic, states that he inspected the Chrysler and found sub-frame damage, control arm

27  _____

28      [2]The submitted declaration is not signed.  *See* Doc. 152-2, p. 70 of 72.

1  damage, unibody damage, mismatched exterior paint, gaps in the hood alignment, and welds
2  on both sides of the strut towers.  Lujan concluded the Chrysler had been in multiple
3  accidents and that an accident involving a 35 mile/hour impact would have occurred to
4  sustain the damage he observed.  Lujan asserts with the damage sustained with a 35
5  mile/hour collision, there would be no question in the mind of the driver that an insurance
6  adjuster's inspection would be needed to evaluate the vehicle for repairs.  Lujan also states
7  that diagnostic tests indicate the airbag of the Chrysler has been deployed and that there is
8  an electrical problem.  Based on Lujan's evaluation of the Chrysler, the Chrysler is not
9  mechanically sound, the Chrysler is structurally unsafe for the road, and the Chrysler's sub-
10  frame impact point shows rust consistent with age and a salt water condition which is
11  inconsistent with the Arizona desert climate.

12  Tucson Dodge, Inc. ("Tucson Dodge") purchased the used Chrysler from Enterprise
13  through Manheim Auction ("Manheim").[3]  Manheim records indicate the Chrysler was sold
14  "AS IS."  Barney Cornell Lewis ("Lewis"), a Tucson Dodge representative testified during
15  a deposition that Tucson Dodge has the option of returning a vehicle if substantial damage
16  is found on a vehicle when the vehicle is purchased from an auction,  Tucson Dodge will
17  quickly inspect a vehicle after purchase.  J-Hanna points out that no document showing such
18  an option has been disclosed.

19  Lewis testified that, in 2006, inspections of purchased vehicles were not consistently
20  conducted, but that an inspection would be conducted prior to its being sold.  Lewis also
21  testified that after the purchase of the Chrysler, an inspection was conducted on the vehicle
22  when it was brought to the Tucson Dodge facility.  Lewis testified that Tucson Dodge has
23  never discovered frame damage to the Chrysler and has no reason to believe there was ever
24  any frame damage to the vehicle.  Lewis also testified that Tucson Dodge understood that,
25  outside of representations with regard to liens, encumbrances and appropriate title, Enterprise

26

27
28  [3]J-Hanna alleges that Manheim's rules provide that AS IS sales may have problems such as accidents, frame damage, flood and fire damage, relating to the odometer.

1    made no other representations with regard to the Chrysler.  Lewis testified that Tucson

2    Dodge did not find any potential frame damage or any damage that would render the

3    Chrysler unsafe when it was acquired.  In fact, Tucson Dodge filled out a "Gold Check

4    Certified Inspection Process Sheet," which identified that the frame and undercarriage were

5    okay.  Lewis testified that, when inspecting for frame damage, any damage would be very

6    obvious to a trained technician and readily observable with a flashlight.  Lewis also testified

7    that he would have been advised of any issues discovered by technicians; however, J-Hanna

8    points out that there is no evidence as to how "sensitive" the technicians were as to the

9    recognizing potential issues.  Lewis also testified that a sensor had been "bad," i.e., that it

10   had an open circuit.  J-Hanna points out that the records indicate the ABS sensor was "open,

11   due to a collision."[4]    A Chrysler Group Vehicle Inspection Report indicates that the

12   installation and removal of an aftermarket alarm system or aging of the vehicle could have

13   caused the electrical open circuit concerns.  Doc. 152-1, p. 45 of 69.  J-Hanna points out that

14   the records do not indicate that Tucson Dodge ever measured the Chrysler for frame damage

15   or gave it a wheel alignment.

16        Lewis also testified that, if Tucson Dodge obtains a vehicle that has a "dirty Carfax"

17   it will be returned.[5]  Further, if Tucson Dodge observed substantial frame damage, a vehicle

18   would be returned.  Further, whether or not Enterprise had reported a vehicle as embezzled

19   or stolen would not make a difference to Tucson Dodge as long as the vehicle was sound.

20        Lewis also testified that Tucson Dodge had no information to believe that the Chrysler

21   was stolen, that there is nothing about the history of the Chrysler that Tucson Dodge

22   presented that identifies that the Chrysler had any type of frame damage or that there were

23

24        [4]J-Hanna does not cite to any specific document to support this assertion.  She further

25   asserts that the ABS light continued to randomly light up after she purchased the Chrysler

26   and eventually stayed on permanently.

27        [5]J-Hanna disputes how Lewis defines a "dirty CarFax" and that it is not up to

28   Enterprise or Tucson Dodge to determine what a consumer would consider a dirty or clear
     CarFax.

1    any problems with the Chrysler because it was either stolen or damaged while stolen.

2         Plaintiff Ariann J-Hanna ("J-Hanna") purchased the Chrysler from Tucson Dodge on

3    November 9, 2006.   Tucson Dodge informed J-Hanna the Chrysler was a pre-owned,

4    certified Chrysler vehicle.   Tucson Dodge informed J-Hanna that a California corporation

5    was the prior owner of the vehicle and that the vehicle was in excellent condition because it

6    had all highway miles.   When asked by J-Hanna if the Chrysler had been involved in an

7    accident or a theft, J-Hanna was told "no."   J-Hanna was provided with a CarFax report

8    (which identified the Chrysler as a rental) and a copy of a "Gold Check Certified Inspection

9    Process Sheet."

10        J-Hanna testified during a deposition that she would not have purchased the Chrysler

11   had she understood the Chrysler had been previously owned by a rental car company, if she

12   had been told that the Chrysler had been involved in an accident, or if she had been told the

13   Chrysler had been the subject of a theft.

14        J-Hanna learned in June of 2008 that the Chrysler had been the subject of a theft and

15   that the Chrysler had been a rental vehicle.   J-Hanna asserts she first learned about frame

16   damage on March 17, 2010.   J-Hanna had an inspection of the Chrysler conducted in May

17   of 2009.   Enterprise asserts J-Hanna contends the results the results of this inspection are

18   wrong.   J-Hanna asserts her "[i]nsurance adjuster from Travelers did not see any collision

19   damage in 2010 or by description could tell there was unseen damage to the control arm,

20   frame, etc., however, referenced seeing the scraping to FT portion of engine cradle and did

21   not realize there was more damage until plaintiff provided a copy of the invoice for

22   alignment showing it could not be aligned." Doc. 152, p. 14.  The document that apparently

23   supports this assertion states:

24        VEHICLE HAS SIGNS OF SCRAPING TO FT PORTION OF ENGINE CRADLE
          AND OWNER PROVIDED INVOICE FOR ALIGNMENT THAT SHOWS
25        CASTER AND CAMBER CONDITION AND VEHICLE CAN NOT BE ALIGNED.
          THE MOST COMMON CAUSE OF THESE CONDITIONS IS POSSIBLE
26        DAMAGE TO LOWER CONTROL ARM FOR CASTER AND STEERING
          KNUCKLE FOR CAMBER.  OWNER STATED THAT SHOP SAID THE PARTS
27        COULD NOT BE ADJUSTED FOR ALIGNMENT.  IF THERE IS FOUND TO BE
          NO DAMAGE TO THESE PARTS, THERE MAY BE DAMAGE TO ENGINE
28        CRADLE - CRADLE WOULD REQUIRE MEASUREMENTS TO VERIFY FOR

POSSIBLE DAMAGE AS NO VISIBLE COLLISION DAMAGE NOTED TO COMPONENTS.

Doc. 152-1, p. 34 of 69, *capitalization in original*.

Pete's Auto attempted a manual alignment and informed J-Hanna that the Chrysler had been hit. Fletcher's determined an alignment failed. Subsequently, Tucson Frame and Body told J-Hanna that there was damage to the sub-frame, control arm, and knuckles. J-Hanna asserts Jim Speece did an appraisal inspection and noted an after market welding on the left front frame.

J-Hanna asserts an April 20, 2006 recovery letter lists the Chrysler was active stolen until the April 20, 2006 recovery date. A March 20, 2006 letter reflects the renter was to return the Chrysler on February 18, 2006. J-Hanna appears to be asserting that Enterprise did not report the Chrysler as stolen until March 31, 2006, which provides her basis for asserting fraud, omission, and concealment of facts. J-Hanna asserts only a ground cosmetic inspection was completed upon return of the Chrysler, with the accident report stating the Chrysler was found with a deep scratch underneath the passenger side front headlight stretching to the side of the front right bumper.

On July 9, 2010, J-Hanna filed an action in the Superior Court of Arizona in and for the County of Pima. The action was removed to this Court. On October 5, 2011, this Court granted J-Hanna leave to file an Amended Complaint. The Court also granted in part Enterprise's Motion for Judgment on the Pleadings; however, the Court denied the Motion for Judgment on the Pleadings as to J-Hanna's claim for a violation of the Arizona Consumer Fraud Act and a claim for common law fraudulent concealment.

On July 27, 2012, Enterprise filed a Motion for Summary Judgment as to the two fraud claims.

*Objections/Disputes to Statement of Facts*

The parties have included objections/disputes to each other's statements of facts. A "genuine" issue of "material" fact cannot be created by a party simply making assertions in

1   its legal memoranda.  *S.A. Empresa De Vicao Aerea Rio Grandense v. Walter Kidde & Co.*,

2   690 F.2d 1235 (9th Cir. 1980).  Declarations and other evidence that would not be admissible

3   may be stricken.  *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991).

4   Moreover, statements must allege personal knowledge.  *See Skillsky v. Lucky Stores, Inc.*,

5   893 F.2d 1088, 1091 (9th Cir. 1990) ("Like affidavits, deposition testimony that is not based

6   on personal knowledge is hearsay is inadmissible and cannot raise a genuine issue of material

7   fact sufficient to withstand summary judgment.").  However, "at the summary judgment

8   stage, courts do not focus on the admissibility of the evidence's form.  [Courts] instead focus

9   on the admissibility of its contents."  *Marceau v. International Broth. of Elec. Workers*, 618

10  F.Supp.2d 1127, 1141-42 (D.Ariz. 2009).

11      The objections/disputes place the statements in context and clarify them.  The

12  objections/disputes are overruled, but the Court only considers the admissible evidence that

13  is supported by specific facts that may show a genuine issue of material fact.  *See Anderson

14  v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

15

16  *Summary Judgment Standard*

17      A party moving for summary judgment has the initial burden to demonstrate, "with

18  or without supporting affidavits[,]" the absence of a genuine issue of material fact and that

19  judgment as a matter of law should be granted in the moving party's favor.  *Celotex Corp.

20  v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986), quoting Fed.R.Civ.P. 56.  A

21  material fact is genuine "if the evidence is such that a reasonable jury could return a verdict

22  for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

23  2505, 2510 (1986).  The facts material in a specific case are to be determined by the

24  substantive law controlling a given case or issue.  *Id.*

25      Once the moving party has met the initial burden, the opposing party must "go beyond

26  the pleadings" and "set forth specific facts showing that there is a genuine [material] issue

27  for trial."  *Id.,* internal quotes omitted.  In opposing summary judgment, plaintiff is not

28  entitled to rely on the allegations of his complaint, Fed.R.Civ.P. 56(e), or upon conclusory

1    allegations in affidavits. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992).

2    Further, "a party cannot manufacture a genuine issue of material fact merely by making

3    assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense (Varig*

4    *Airlines) v. Walter Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

5         The Court is not to make credibility determinations with respect to the evidence

6    offered and is required to draw all inferences in a light most favorable to the non-moving

7    party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th

8    Cir. 1987), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

9    (1986); *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996) (a court

10   "[must] not weigh the evidence[, make credibility determinations,] or determine the truth of

11   the matter" at the summary judgment stage, but may only determine whether there is a

12   genuine issue for trial); *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1054 (9th Cir. 1999);

13   *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d

14   1322, 1328 (9th Cir. 2000) (recognizing that on a motion for summary judgment, "a district

15   court is entitled neither to assess the weight of the conflicting evidence nor to make

16   credibility determinations"). Summary judgment is not appropriate "where contradictory

17   inferences may reasonably be drawn from undisputed evidentiary facts[.]" *Hollingsworth*

18   *Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir. 1980).

19

20   *Consumer Fraud and Common Law Fraud*

21        Enterprise argues J-Hanna cannot establish the elements of consumer fraud or

22   actionable fraud. Further, Enterprise asserts this Court must evaluate claims of fraud by clear

23   and convincing evidence in resolving summary judgment. *Orme School v. Reeves*, 166 Ariz.

24   301, 802 P.2d 1000 (1990). Specifically, Enterprise asserts there is no evidence to establish

25   Enterprise made a false promise or misrepresentation in connection with the sale of the

26   Chrysler or that the hearer (Tucson Dodge) had a consequent and proximate injury. *Dunlap*

27   *v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 342, 666 P.2d 83, 87 (App. 1983). Although

28   J-Hanna has specifically asserted that she relied upon a statement of no accidents, a statement

1   of no theft and, importantly, a statement as to the use of the vehicle which was a statement

2   other than the vehicle being a rental vehicle, all made by Tucson Dodge, there is no evidence

3   implicating Enterprise in any aspect of the purchase.  Indeed, there is no evidence before the

4   Court that any "misrepresentations or statements were made by [Enterprise] to [J-Hanna] 'in

5   connection with the sale or advertisement' of the Chrysler. The implied private cause of

6   action under the [Consumer Fraud Act] is not available to [J-Hanna] on this record. *Sullivan

7   v. Pulte Home Corp.*, 231 Ariz. 53, 61, 290 P.3d 446, 454 (App. 2012), *vacated on other

8   grounds*.  Further, as the record does not establish that Enterprise was a party to a transaction

9   with J-Hanna, the elements of a fraudulent concealment are not established.  *Id*. at 61-62.

10      Additionally, there is no evidence to show that an accident resulting in frame damage

11   occurred while the Chrysler was in the possession of Enterprise.   Although Lujan's

12   declaration establishes the Chrysler's sub-frame impact point shows rust consistent with age

13   and a salt water condition which is inconsistent with the Arizona desert climate, this does not

14   establish an accident causing frame damage occurred while the Chrysler was owned by

15   Enterprise.  For example, there is no expert opinion offered to establish that this rust

16   condition necessarily or likely resulted from an accident causing frame damage in an area

17   other than the Arizona desert climate, rather than some other cause or during the initial

18   assembly of the Chrysler.

19      Further, no evidence has been presented that Enterprise knew of any alleged frame

20   damage.  Although J-Hanna asserts Enterprise should have known of frame damage (based

21   on Lujan's assertion regarding the type of damage), there is no evidence supporting that

22   assertion.   Rather, Enterprise's contemporaneous records show the extent of damage

23   Enterprise was aware of and the repairs made by Enterprise.  Further, there is no evidence

24   that any frame damage existed at the time the Chrysler was sold by Enterprise.  Indeed,

25   although Lewis testified that, at the time of the purchase of the Chrysler, Tucson Dodge did

26   not consistently initially inspect vehicles, Lewis testified they were inspected prior to Tucson

27   Dodge selling a vehicle.  Further, an inspection conducted for J-Hanna in May 2009 did not

28   observe any frame damage.  Lujan's speculation does not present a genuine issue of material

1   fact that Enterprise knew or should have known about the alleged frame damage.[6]  Therefore,

2   Enterprise could not have made a misrepresentation of a material fact and could not have

3   made a "false impression in order to mislead another".  *Sarwark Motor Sales, Inc. v.*

4   *Husband*, 5 Ariz. App. 304, 309, 426 P.2d 404, 409 (1967).

5        Further, Enterprise argues that there is no evidence of any proximate injury resulting

6   from whatever Enterprise may or may not have done. *See Ontiveros v. Borak*, 136 Ariz. 500,

7   667 P.2d 200 (1983).  Rather, J-Hanna has stated that she relied on facts, be they truthful or

8   false, provided by Tucson Dodge and not Enterprise.  Indeed, the evidence establishes there

9   was no injury to Tucson Dodge – Tucson Dodge inspected the Chrysler, did not observe any

10  frame damage, and resold the Chrysler.

11       Additionally, Enterprise did not make clear that the Chrysler had been "stolen."  J-

12  Hanna argues this omission, along with failing to identify the Chrysler as a "manufacturer

13  repurchase" and failing to disclose the alleged frame damage, constitutes material

14  misrepresentations.  However, any alleged misrepresentation as to the "theft" cannot be said

15  to be material as Lewis's testimony made clear that such a fact would not have been a factor

16  considered by Tucson Dodge.  Further, J-Hanna's reliance on California statutes for a

17  requirement of a "manufacturer repurchase" does not take into account that Enterprise sold,

18  through an auction house, the Chrysler in Arizona.  Lastly, as previously discussed, there can

19  be no material misrepresentation (or omission) where Enterprise did not know of any alleged

20  frame damage and Enterprise did not make the alleged misrepresentations (or omissions) to

21  J-Hanna.

22       There is no evidence to establish a genuine issue of material fact as to whether a

23  transaction occurred between Enterprise and J-Hanna, whether Enterprise knew of the

24  alleged frame damage, whether Enterprise made a material misrepresentation to Tucson

25

26        [6]Indeed, J-Hanna has argued that a measurement was needed to ascertain the frame
    damage.  There has been no evidence presented that Enterprise was aware of any substantial
27  damage that may have even warranted the taking of measurements to determine whether
28  there was any frame damage prior to the sale of the Chrysler.

Dodge, whether Tucson Dodge relied on any material misrepresentation, or whether Tucson Dodge was proximately injured by any material representation.  Summary judgment on the fraud claims is appropriate.

*Additional Arguments by J-Hanna*

J-Hanna discusses Tucson Dodge's conduct in responding to Enterprise's Motion for Summary Judgment.  However, J-Hanna does not present any explanation how Tucson Dodge's alleged deceitful indifference affects a consideration of whether Enterprise made any material misrepresentations or omissions.

J-Hanna also discusses that Enterprising Leasing Company of Phoenix was identified as the seller of the Chrysler.  However, assuming for the sake of summary judgment consideration that this is anything more than a clerical error, J-Hanna does not present any basis to conclude that this a material misrepresentation.  Rather, Lewis specifically testified that this was a non-issue as far as Tucson Dodge was concerned.

*Punitive Damages*

As the Court has determined that no genuine issue of material fact is in dispute as to the fraud claims, the Court declines to address whether a claim for punitive damages has been established.

Accordingly, IT IS ORDERED the  Motion for Summary Judgment (Doc. 125) is GRANTED.  As the Motion to Vacate the AAA Award (Doc. 189) remains pending, the Court declines to direct the Clerk of Court to enter judgment at this time.  *See* Fed.R.Civ.P. 54(b).

DATED this 16th day of December, 2013.

Cindy K. Jorgenson
United States District Judge